IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| PATRICIA STANTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 06-0499-CV-W-ODS |
| ) | |
| MICHAEL J. ASTRUE,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING
## FINAL DECISION OF COMMISSIONER OF SOCIAL SECURITY

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits under Title II of the Social Security Act. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in June 1965 and has a high school education. She has prior work experience as youth specialist, corrections officer, office clerk and receptionist. She filed an application for disability in September 2003, alleging an onset date of January 27, 2003. On that date, Plaintiff suffered compression fractures at T3 and T4, broken ribs, whiplash and a concussion when her truck was rear-ended. On February 8 her doctor (Dr. Robert Schaaf) prescribed morphine and told her to return in a week. R. at 215. Plaintiff could not tolerate the morphine, so Dr. Schaaf prescribed Vioxx and arranged for an MRI. The MRI "was unremarkable," so Dr. Schaaf referred Plaintiff to Dr. Mary Jo Middleton, a specialist in physical medicine and rehabilitation. R. at 212. On March 28 – before her appointment with Dr. Middleton – Plaintiff told Dr. Schaaf she

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and should, therefore, be substituted as the Defendant in this case. Fed. R. Civ. P. 25(d)(1).

was "working for Mastio and Co. talking on the telephone." She reported difficulty sleeping, pain in her head and eyes, and tingling in her right arm. Dr. Schaaf prescribed Ambien to help her sleep and physical therapy. R. at 211.

Plaintiff first saw Dr. Middleton on April 2, 2003. Plaintiff reported she "currently does computer work and works at Mastio. She states her pain is always 5/10. It never gets better. With any activity it goes to a 7.5/10. She is improved but her pain is still very intense." She also experienced "major problems sleeping since the accident." Tests revealed limited range of motion in the right arm and in the cervical spine. Dr. Middleton continued the medication Dr. Schaaf prescribed and also prescribed Lidoderm patches, Robaxin, physical therapy, and use of a TENS unit. R. at 175-77.

On May 9, Plaintiff told Dr. Middleton "therapy was helping, but that she wanted to get extra therapy and a trigger point injection as soon as possible." An injection was administered that day and Plaintiff was to return in six months after completing physical therapy. R. at 170. However, Plaintiff returned later that same day complaining of "severe soreness in the right neck, dizziness and numbness and heaviness [in] the right arm." Plaintiff has not been taking her Robaxin, which Dr. Middleton opined was probably causing "more spasm." Dr. Middleton also indicated the reaction to the injections would likely be temporary. R. at 171-72.

Plaintiff's next visit to Dr. Middleton – on June 20, 2003 – was her last. Since receiving the injections in May, Plaintiff had returned to physical therapy and "is much better. She states the chest wall is better, the shoulder is better, but she still has tightness and soreness in the rhomboid muscles. . . . She denies any numbness or tingling. She states she doesn't want anything anymore." Plaintiff told Dr. Middleton she had "been working on landscaping building a rock wall and a walk" and her pain ranged from 1/10 to 8/10, with an average of 3/10. The worse pain lasted for two hours after working or lifting. R. at 167-68.

Plaintiff returned to Dr. Schaaf on July 14, 2003, complaining of back pain and difficulty sleeping. Plaintiff also claimed "she is just not better and physical therapy helped some," so Dr. Schaaf indicated he would arrange for additional therapy. R. at 210. On August 1, Dr. Schaaf wrote that an MRI revealed "lumbar spondylosis with

2

moderate posterior central disc protrusion at L4-5 but no significant nerve root impengmentcy." He suggested, and Plaintiff agreed, that Plaintiff should "go see Dr. Blatt in KC." R. at 208. The Record does not reflect Plaintiff saw Dr. Blatt. Instead, she continued physical therapy until near the beginning of September, at which time she opted to go to a chiropractor. R. at 207. Plaintiff next saw Dr. Schaaf in mid-October following hospitalization for what Plaintiff believes (but the hospital did not believe) was a stroke. Dr. Schaaf referred Plaintiff to a neurologist. R. at 207. There are no more records of visits to Dr. Schaaf.

A consultative medical report was prepared by Dr. Susan Rosamond in November 2003; it is not clear whether she based her opinions on just a review of Plaintiff's medical records or if she also performed a physical examination. Regardless, Dr. Rosamond observed Plaintiff's medical records indicated she was "more functional" than indicated in her application and her alleged impairments were not credible in light of the medical condition documented in the records. She indicated Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand or walk six hours per day, and sit six hours per day. R. at 218-225.

On December 9, 2003, Plaintiff saw Dr. Alejandro Blachar at the Heartland Health System Outpatient Pain Clinic, complaining of pain in her mid and low back radiating to her right leg. She expressed concern the pain was "getting worse" and could be alleviated only by "laying with pillows under back and knees propped up" because "any type of physical activity exacerbates the pain." At the time, Plaintiff was taking medication for sleep and an anti-inflammatory. Plaintiff expressed a preference not to have injections in the lumbar region, so Dr. Blachar prescribed methadone and suggested joint injections in the sacroiliac region. R. at 244-46. The injection was administered in late December. R. at 241-43. Her methadone dose was increased and trigger point injections were administered in the lumbar region on January 20, 2004. R. at 238-40. Three weeks later, however, Plaintiff reported the latest injections made the pain worse, and Dr. Blachar discontinued the methadone and prescribed a Duragesic patch. R. at 236-37.

3

The next record of a visit to Dr. Blachar is from July 20, 2004. Plaintiff reported taking methadone twice a day,[2] which "did help with the pain." She also reported the sacroiliac injections "g[a]ve her some degree of pain relief." Dr. Blachar prescribed methadone and Lidoderm patches and made plans to review Plaintiff's EMG and administer trigger point injections in her neck. R. at 234-35. One week later, the methadone was decreased and the injections were administered in her neck. R. at 231-33.

On August 10, 2004, Dr. Blachar's concluded Plaintiff "would be a reasonable candidate for a lumbar epidural steroid injection, given the findings on [her] EMG." He also indicated a need to "set her up for an organized physical therapy program for strengthening and conditioning of her low back musculature." R. at 230. On August 30, Plaintiff told Dr. Blachar her pain was a two out of ten. Steroid injections were administered in Plaintiff's lumbar region on August 30, and there are no further records of visits to Dr. Blachar. R. at 227-29.

On October 5, 2004, Plaintiff went to Heartland Neurosurgery for an evaluation, apparently on referral from Dr. Blachar. A report from the visit indicates Plaintiff's "[e]xamination is within normal limits, except she is tender to thoracic and lumbar paraspinous palpation, especially on the right. She has decreased lumbar range of motion." Plaintiff expressed a willingness to undergo surgery "if it could be guaranteed that she would be completely pain free." No such guarantee was provided, and Plaintiff indicated she would "return to the clinic if she is not improved." R. at 256-57. Plaintiff returned two weeks later, at which time Dr. Brent Peterson explained "her symptoms do not necessarily fit the MRI findings" and discussed the potential risks and benefits of "minimally invasive microdiscectomy at L4-5 on the right." Plaintiff agreed to the surgery. R. at 254-55.

---

[2]It is quite likely that something is either missing from, or was not submitted for inclusion in, the Record, because Plaintiff's last visit to Dr. Blachar resulted in the methadone being replaced with a Duragesic patch, and there is no record of methadone being reinstated.

4

Dr. Peterson performed the surgery on October 27, 2004. R. at 252-53. On November 23, Plaintiff was "very pleased with her progress as she has substantially less pain in her back and her lower extremity." Plaintiff was instructed to engage in physical therapy, "slowly increase her activity level as tolerated," and return in six weeks. R. at 251. By January 20, 2005, Plaintiff had not commenced physical therapy. She reported experiencing pain in her back, but not the radiating pain she reported prior to the surgery. Dr. Peterson prescribed a muscle relaxer. R. at 249. There are no further records indicating Plaintiff contacted Dr. Peterson or the clinic after January 20, 2005.

Plaintiff began physical therapy on January 25, 2005. On her second visit (two days later), Plaintiff reported feeling better; she no longer experienced pain in her legs. R. at 271. Plaintiff canceled her next three appointments, returning for physical therapy on February 15. She reported being hospitalized the previous week due to complications from diabetes, and she was "stiff and sore" from lying in a hospital bed – but the radiating pain she previously experienced was absent. R. at 270. There are no further records regarding Plaintiff's participation in physical therapy.

An MRI designed to evaluate Plaintiff's complaints of neck pain was performed in August 2005 and revealed "[n]o evidence of central canal or neuroforaminal narrowing" and normal alignment in the cervical area. R. at 299. This MRI appears to have been ordered by Dr. Blachar, but as noted earlier there are no records of Plaintiff visiting Dr. Blachar after August 2004.

Testing performed in July 2005 resulted in a diagnosis of carpal tunnel syndrome: severe in Plaintiff's right hand and mild in her left. R. at 301-02. No other medical records relate to this condition.

The administrative hearing was held on September 28, 2005. Plaintiff testified she tried to work as a telemarketer in March 2003, but could not "sit and talk on the phone without getting really dizzy and lightheaded." R. at 32. Prior to that, she worked at a boys' facility but was "let go" after approximately nine months. R. at 32, 38. Plaintiff had transferred to the youth facility from an adult institution, where she had worked as a corrections officer for two years. R. at 39. She reported experiencing

5

asthma attacks, but did not indicate how frequently they occur. R. at 32-33. She reported having carpal tunnel surgery on her left hand "years ago" and does not want to have surgery on her right because her left hand has "little strength" following the surgery. R. at 35. She has difficulty carrying things up and down stairs. R. at 35-36. Plaintiff estimated that she could sit for thirty minutes at a time, needs to lay down "from time to time during the day," and can lift a gallon of milk for a short period of time. R. at 37-38.

Plaintiff's mother and Plaintiff's friend also testified. They described Plaintiff as a rather active individual prior to the accident, but her activity had decreased to almost nothing after the accident.

A vocational expert ("VE") testified in response to hypothetical questions. The ALJ first asked her to assume an individual of Plaintiff's age, education and work history who could lift twenty pounds occasionally and ten pounds frequently, stand and walk for thirty minutes at a time and four hours in an eight hour day, sit with normal breaks for six hours in an eight hour day, and was unable to climb, work near dangerous machinery, fumes, extremes of heat or cold, or engage in "rapid repetitive grasping," stooping, kneeling, crouching or crawling. The VE testified such an individual could return to their past work as a youth specialist. In addition, the VE testified such an individual would have the residual functional capacity to work as a machine tender, automatic packer operator, or machine operator. R. at 48-49. When the hypothetical was changed to reflect an individual who could lift ten pounds occasionally and negligible weight frequently, and needed a sit/stand option throughout the day and the ability to rest in a reclining position once or twice a day for up to thirty minutes, the VE testified such a person could not work at a position existing in substantial numbers in the national economy. R. at 49-50.

The ALJ discounted Plaintiff's testimony for a variety of reasons. The Record did not contain any medical opinions suggesting Plaintiff was limited in the manner or to the degree she described, and the medical reports did not identify a condition that could be expected to cause the extreme pain she alleged. Plaintiff's activities were inconsistent with a claimed inability to engage in physical activity; most notably, Plaintiff was involved

6

in landscaping and building a rock wall and walk. Plaintiff complains of asthma-related symptoms, but continues to smoke. The medical records do not include complaints by Plaintiff about her asthma, diabetes-related blackouts, or carpal tunnel syndrome that are nearly as severe as those she described during the hearing. Medical records prepared at various times documented positive results from medication and physical therapy. The ALJ also considered Plaintiff's inconsistent work history. Ultimately, he found Plaintiff's limitations to be consistent with those expressed in his first hypothetical question and determined Plaintiff retained the residual functional capacity to perform her past relevant work; he also found that even if she could not perform her past work, she retained the ability to perform other work in the national economy.

Plaintiff sought review of the ALJ's decision by the Appeals Council. She obtained a report from Dr. Blachar dated December 12, 2005 (approximately six weeks after the ALJ's decision) and submitted it to the Appeals Council. The report – a Residual Functional Capacity Questionnaire – indicates Dr. Blachar first saw Plaintiff on December 9, 2003, but does not indicate when he last saw Plaintiff. He described Plaintiff as suffering from chronic pain that rated a ten on a scale of one to ten and capable of walking for one block, sitting for no more than ten minutes at a time and two hours per day, standing for no more than ten minutes at a time and two hours per day. He opined Plaintiff needed an unknown number of unscheduled breaks of at least five minutes to rest and she would need to miss four days of work per month due to her impairments or necessary treatment. R. at 305-10. The Appeals Council considered this report, R. at 10, but concluded it did not justify changing the ALJ's decision. R. at 7-9.

## II. DISCUSSION

In seeking review in this Court, Plaintiff presents a rather narrow argument. She does not contest the ALJ's decision based on the record as it existed when his decision was made, but invokes sentence six of 42 U.S.C. § 405(g) and contends the case should be remanded based on Dr. Blachar's December 2005 report, which she alleges

7

constitutes new and material evidence. The argument misstates the proper procedure to be followed when evidence is submitted after the ALJ renders a decision. In this case, the Appeals Council clearly considered the 2005 report; therefore, it is inappropriate to remand for consideration of the report. E.g., Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994) ("The Appeals Council thus explained why it was denying review even though Ms. Riley had submitted additional evidence. Under those circumstances, remand for consideration of the reports in the first instance is inappropriate.").

> Once it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review. Instead, our role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.

Id.; see also Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).

The Court's review of the Record reveals substantial evidence supporting the ALJ's decision. "Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. Cf. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or

8

> mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Plaintiff's subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, the absence of objective medical evidence remains a relevant factor to consider. The ALJ observed several occasions in which physicians indicated Plaintiff's complaints were disproportionate in comparison to her MRI results. Only Dr. Blachar suggests Plaintiff's functional capacity is as limited as she professes, but his contemporaneous office notes are inconsistent with this December 2005 report. Moreover, the last record of Plaintiff seeing Dr. Blachar is from August 2004 – before the surgery was performed. Thus, at best Dr. Blachar's opinion appears to reflect Plaintiff's pre-surgery status.

9

In addition, there are numerous contradictions in the Record. Plaintiff professed to be unable to work since the accident, but did start a job – described in different places as a telemarketing job or a computer-related job – approximately three months after the accident. She allegedly quit because sitting made her dizzy, yet dizziness was not among the problems she reported to doctors. Plaintiff's inconsistent work hisotry justified the ALJ's conclusions Plaintiff is not strongly motivated to work. Approximately six months after the accident Plaintiff was engaged in landscaping and other strenuous activity. Plaintiff reported that various treatments provided relief, then often discontinued the treatment in question and went to another doctor complaining of pain.

The medical records also reflect Plaintiff's pain has diminished following treatment, including particularly the surgery. Along this vein, Plaintiff's testimony at the hearing did not discuss her back pain at great length. Instead, she focused on her diabetes-related blackouts and carpal tunnel syndrome. While there is no doubt Plaintiff suffers from diabetes and carpal tunnel syndrome, the degree of difficulty these conditions cause is not confirmed in any medical reports or statements Plaintiff made to doctors seeking treatment. The ALJ was justified in discounting their seriousness.

The ultimate factual issue is: how much pain does/did Plaintiff suffer? There is evidence to support Plaintiff's position, but the ALJ's decision is supported by substantial evidence in the Record as a whole.

### III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: July 6, 2007    UNITED STATES DISTRICT COURT